[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 23-10992

————————————————

FAMILY HEALTH CENTERS OF SOUTHWEST FLORIDA, INC.,
a Florida non-profit corporation,

Plaintiff-Appellee,

*versus*

SECRETARY, FLORIDA AGENCY FOR HEALTH CARE
ADMINISTRATION,

Defendant-Appellant,

SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN
SERVICES,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 2:21-cv-00278-SPC-NPM

_____

Before ROSENBAUM, NEWSOM, and ABUDU, Circuit Judges.

PER CURIAM:

This is a case about Medicaid reimbursement rates. At the risk of oversimplifying matters, federal law establishes a multipart formula for determining how much states have to reimburse Federally Qualified Health Centers ("FQHCs") for services rendered to Medicaid beneficiaries. *See* 42 U.S.C. § 1396a(bb). As relevant here, an FQHC is entitled to an upward adjustment of its rate when there has been "any increase . . . in the scope of [the] services" that it provides. *Id.* § 1396a(bb)(3)(B).

The dispute underlying this appeal arose when Family Health Centers of Southwest Florida requested an increase in its per-patient reimbursement rate from the Florida Agency for Health Care Administration, the office that manages the Medicaid program within the state. The state denied Family Health's request because under its interpretation of § 1396a(bb)(3)(B), a change in the "scope of . . . services" for FQHC-reimbursement purposes occurs only with the "addition of a new service" or "the elimination of an existing service." Fla. Medicaid State Plan Amendment No. FL-14-012, IV(D) (approved July 1, 2014),

https://www.medicaid.gov/State-resource-center/Medicaid-State-Plan-Amendments/Downloads/FL/FL-14-012.pdf [https://perma.cc/2MER-QTF9].

Family Health sued in federal district court, challenging the state's definition of "scope of services" as impermissibly narrow and arguing that it was entitled to an adjustment under § 1396a(bb) because it had expanded what it described as the "type," "intensity," "duration," and "amount" of its services. The district court sided with Family Health. Concluding that the state's interpretation of the phrase "scope of services" contravened federal law, the court entered summary judgment in Family Health's favor and ordered the state to promulgate a new Medicaid Plan that complied with § 1396a(bb).

After careful consideration, we affirm.

## I

### A

Under federal law, states are required to reimburse Federally Qualified Health Centers on a fixed per-patient basis for certain services provided to Medicaid beneficiaries. As relevant here, 42 U.S.C. § 1396a(bb) provides the governing reimbursement formula. Although the calculation comprises several inputs, the dispute here centers on § 1396a(bb)(3)(B)'s requirement that states increase an FQHC's reimbursement rate for certain medical services when there has been "any increase . . . in the scope of such services."

Family Health Centers of Southwest Florida is an FQHC. More than half of Family Health's patients are Medicaid beneficiaries, and it reports that it has grown substantially in recent years. For instance, over the past two decades, Family Health has added 11 new sites, expanded several programs, and increased staffing levels at existing locations. For those reasons—among others—Family Health says that the costs of treating Medicaid patients have risen substantially.

The Florida Agency for Health Care Administration manages the state's Medicaid program and, importantly for present purposes, sets reimbursement rates for FQHCs. In 2019, Family Health asked the state to increase its reimbursement rate, arguing that "[s]ince 2001 when the initial baseline was established, [it had] continued to increase services provided to its patient population in Southwest Florida."

Citing Florida's Medicaid plan, the state denied Family Health's request in substantial part. Under the state's plan, a change in the "scope of . . . services" occurs only with "addition of a new service" or "[t]he elimination of an existing service." Based on that interpretation, the state denied the bulk of Family Health's requested increase.

**B**

Family Health Centers sued in federal district court, asserting that the state's definition of "scope of . . . services" was impermissibly narrow vis-à-vis § 1396a(bb)(3)(B). In particular, Family Health stressed that it had increased what it labeled the "type,"

"intensity," "duration," and "amount" of its services and was therefore entitled to a higher reimbursement rate under § 1396a(bb)(3)(B). Family Health asked the district court to (1) declare the state's definition of "scope of . . . services" unlawful; (2) require the state to submit a new plan to the U.S. Department of Health and Human Services that defines the phrase "increase . . . in the scope of . . . services" to include an expansion of "the type, intensity, duration and/or amount of services"[1]; and (3) compel the state to reconsider and grant Family Health's request for an increased reimbursement rate.

On cross-motions, the district court granted summary judgment to Family Health. Based on § 1396a(bb)'s "[t]ext, context, and structure," and the "policy considerations underlying the statute," the district court concluded that the state's definition of "scope of services" contravened federal law. *Fam. Health Ctrs. of Sw. Fla., Inc. v. Marstiller*, No. 2:21-CV-278-SPC-NPM, 2023 WL 2264138, at *4–5 (M.D. Fla. Feb. 28, 2023). The court, though, didn't go any further. While ordering the state back to the drawing board to adopt a new definition that complied with § 1396a(bb), the district court declined to "extend its reach to define" the contours of what counts as an "increase . . . in the scope of [an FQHC's] services." *Id.* at *5.

---

[1] States must submit their Medicaid plans for approval to the Centers for Medicare and Medicaid Services, which exists within the U.S. Department of Health and Human Services. *See* 42 U.S.C. §§ 1396a, 1396c; 42 C.F.R. §§ 430.12–430.20 (2023).

This is the state's appeal.[2]

## II

This case turns on the interpretation of 42 U.S.C. § 1396a(bb)(3)(B). "[W]hen called on to resolve a dispute over a statute's meaning, [a court] normally seeks to afford the law's terms their ordinary meaning at the time Congress adopted them." *United States v. Pate*, 84 F.4th 1196, 1201 (11th Cir. 2023) (quoting *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021)). In doing so, we read the relevant words and phrases in context, which, importantly, can "disambiguate[]" language whose meaning might not otherwise be clear on its face. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 70 (2012).

The formula outlined in § 1396a(bb) is complicated, but, in essence, an FQHC's reimbursement rate is based on (1) its average costs in 1999 and 2000, (2) a per-year inflationary adjustment tied to the Medicare economic index, and, particularly relevant here, (3) "any increase or decrease in the scope of [certain] services" that it provides. § 1396a(bb)(2)–(3). The question before us is: What counts as an "increase or decrease in the scope of . . . services" within the meaning of § 1396a(bb)(3)(B)?

By its own admission, Family Health's position has undergone "some evolution" during the course of this appeal. *See* Oral Arg. at 18:19. In its complaint, Family Health argued that an

---

[2] We review a district court's order granting summary judgment de novo. *Turner v. Am. Fed'n of Tchrs. Loc. 1565*, 138 F.3d 878, 881 (11th Cir. 1998).

increase in the "scope of . . . services" occurs whenever an FQHC expands the (1) "type," (2) "intensity," (3) "duration," or (4) "amount" of the services that it provides. *See, e.g.*, Doc. 31 at 17–22. On appeal, though, Family Health focuses on what it claims is the ordinary meaning of "scope," which it says can mean either "range" or "extent." *See, e.g.*, Br. of Appellee at 12–13. For instance, Family Health argues that, among other things, the "range" or "extent"—and thus the "scope"—of an FQHC's services increases when it, say, cares for a sicker population of patients (who need more services and higher-level treatment), offers new "treatment modalities" (*e.g.*, a fluoride regimen added to routine teeth cleanings), purchases more advanced equipment, or adds new service locations. *Id.* at 13–14.

For its part, the state maintains that the proper interpretation of "scope of services" is narrower, encompassing only the "addition of a new service" or the "elimination of an existing service." Although the state concedes that, in the abstract, the term "scope" could take on different meanings, it asserts that statutory context clarifies its proper understanding as used in § 1396a(bb). Perhaps most saliently for present purposes, the state emphasizes that other subsections of § 1396a repeatedly use the phrase "amount, duration, [and/or] scope." That particular linguistic combination, the state argues, demonstrates that the terms "amount" and "duration" are different from—and not enveloped by—the term "scope." And, the argument goes, because § 1396a(bb)(3)(B), unlike its neighboring provisions, refers only to "scope," and not to either "amount" or "duration," it excludes them. *See* Br. of Appellant at

12–13. Accordingly, the state contends that an increase in the "scope of . . . services" does not include any increase fairly attributable to an expansion of the "amount" or "duration" of such services. *See id.* With respect to Family Health's other alleged changes in "scope," the state casts them as changes in "costs," which, it says, are already factored into the reimbursement formula by the inflationary adjustments prescribed by § 1396a(bb)(3)(A). *See id.* at 14–16.

The district court basically agreed with Family Health. In particular, the court reasoned—as Family Health argues before us—that the ordinary meaning of "scope" includes changes in "extent." *Fam. Health Ctrs.*, 2023 WL 2264138, at *3. When combined with the breadth of the introductory term "any," the court concluded that the plain meaning of the phrase "any increase or decrease in the scope of . . . services" precluded the state's narrower definition—which, again, would include only the addition of an entirely new, definable service. *Id.* Even so, as already explained, the district court didn't seek to more precisely "define 'any increase or decrease in the scope of such services,'" but rather simply ordered the state to come up with a new definition that complies with § 1396a(bb)(3)(B). *Id.* at *5.

### III

Although the issue is certainly not without complexity, we hold that the district court correctly ruled that the ordinary meaning of the phrase "any increase . . . in the scope of such services" encompasses more than just the addition of a new service. As the

district court observed, the term "scope" can mean the "range" or "extent" of something. *See id.* at \*3; *see, e.g.*, *Scope*, Merriam-Webster, https://www.merriam-webster.com/dictionary/scope [https://perma.cc/SLH4-Y2DK] (last visited March 30, 2025) (defining "scope" as the "extent of treatment, activity, or influence" or the "range of operation"). As so defined, the phrase "increase . . . in the scope of such services" might include any of a number of service expansions other than addition of an entirely new service.

The state responds by invoking the rule against surplusage. Specifically, the state points to other provisions within § 1396a that use the conjunctive phrase "amount, duration, and scope" when specifying the requirements for Medicaid coverage. *See, e.g.*, 42 U.S.C. § 1396a(10)(G) (referring to "the making available of such services of the same amount, duration, and scope, to individuals of any other ages"). The state argues that, in order to avoid rendering the terms "amount" and "duration" superfluous in these provisions, we must interpret them as wholly distinct from—and non-overlapping with—the term "scope." Under this reading, a change in the "scope" of services cannot include anything that would constitute a change in "amount" or "duration." According to the state, there are only two changes in "scope" of services that aren't also changes in "amount" or "duration": "the addition of a new service not previously provided by the FQHC" and "the elimination of an existing service provided by the FQHC." So an

increase in "scope" of services can result only from the addition of a new service.

We disagree. Just as the provision of an additional service can be described as an increase in "scope" of services, so too can it be described as an increase in "amount." The word "amount" ordinarily means "total number or quantity." *See, e.g.*, *Amount*, Merriam-Webster, https://www.merriam-webster.com/dictionary/amount [https://perma.cc/6R59-5EEH] (last visited March 30, 2025). When an FQHC adds a new service—thereby increasing its number of services from, say, five to six—it is increasing the "amount"—or "total number"—of services that it provides.

We think the state misunderstands the rule against surplusage. As applied to § 1396a, the rule does not require that the terms "amount," "duration," and "scope" be wholly distinct and non-overlapping. Rather, the rule allows that the terms overlap to some degree. *See Young v. Grand Canyon Univ., Inc.*, 980 F.3d 814, 820 (11th Cir. 2020) ("Language in two separate sections of a regulation isn't superfluous merely because it overlaps."). Having said that, the rule against surplusage does counsel that there must be *some* distinction between "scope," "amount," and "duration," such that not *every* change in "amount" or "duration" is also a change in "scope." When the state drafts a new definition, it should keep this in mind.

★ ★ ★

For the foregoing reasons, the district court's judgment is **AFFIRMED**.

ROSENBAUM, Circuit Judge, concurring:

I agree with the Majority Opinion and the district court that the State's definition of "scope of services" is impermissibly narrow, in violation of federal law. That's so because Florida's definition is inconsistent with the Medicaid statute's direction that states must adjust payment rates based on "any increase or decrease in the scope of . . . services." 42 U.S.C. § 1396a(bb)(3)(B).

I write separately to offer the following three observations for the State to consider, as it rewrites its reimbursement plan to comply with federal law.

*First*, in assessing the meaning of "scope," "duration," and "amount" as § 1396a uses the terms, the State may consider whether those terms refer to services that are center-specific or visit-specific. In other words, those terms might refer to services that are *generally available* at Federally Qualified Health Centers ("center-specific"), or they might refer to services that are *provided in each visit*, on average ("visit-specific").

This distinction matters for understanding what the terms might mean. For example, the "amount of services" could mean the number of services that the center offers to its patient population as a whole (like specialties such as cardiology or endocrinology). Or the "amount of services" could mean the number of services a patient receives per visit, on average (like types of procedures and diagnostic tools, such as examination, x-rays, and bloodwork). Similarly, the "duration of services" could refer to the length of the complete period when a patient is under a doctor's

care, or the number of times patients can access certain services at the center as a general matter. For instance, can a physical-therapy patient receive sessions as needed over a three-month period or receive only two sessions? Alternatively, the "duration of services" could refer to the amount of time the facility takes to provide a particular service in an average visit.

If "amount" or "duration" refers to the services provided during each patient's visit, it might be more difficult to read "scope" as carrying a meaning that does not intrude on "amount" or "duration." Imagine, for instance, that Clinic A and Clinic B both offer pediatric services and optometry services. A patient goes to Clinic A and receives both pediatric services and optometry services during that visit. Next time, the patient goes to Clinic B and receives only pediatric services.

If "amount of services" means the number of services the facility offers to the public overall (the broader, center-specific meaning), then both clinics are equal in terms of amounts of services because they both offer two types of services. But arguably, the "scope of services" at Clinic A is more extensive because patients, assuming this is an average experience, receive twice as many services *per visit* as Clinic B patients. If, on the other hand, "amount of services" means the number of services provided to a patient per visit (the narrower, visit-specific meaning), then Clinic A has a greater "amount of services." And if that's the case, "scope of services" can't simply refer to instances when patients receive

more services per visit—without becoming coextensive with the meaning of "amount."

In considering what level of analysis the terms operate at, the State may also take into account the overall structure of Section 1396a. That section refers to "amount" and "duration" in contexts such as the "amount, duration, and scope" of services available "to *all* pregnant women" or "to *any* other individuals." *See* 42 U.S.C. § 1396a(10)(G) (emphases added). On my read, this text may suggest that we should view "amount" and "duration" at the broad level of services each *center* offers to all qualifying people, rather than at the per-visit level.

But Section 1396a(bb), in contrast, expressly refers to "a per visit basis" when discussing how reimbursement rates should be calculated for Federally Qualified Health Centers. That is, rates are "calculated on a per visit basis." *Id.* § 1396a(bb)(3), (4). This difference suggests to me that the term "scope" as used in Section 1396a(bb) refers to services on a per-visit basis, while the terms "amount" and "duration" (and even "scope") in the rest of the statute seem to operate at the broader center-level. After all, it shows that Congress used the phrase "per visit" when that's what it wanted. And Congress decided not to use the "per visit" language in other parts of the statute. Instead, it chose to refer to "all" and "any" patients. This suggests that, for the parts of the statute that lack the phrase "per visit," Congress intended for "amount" and "duration" to refer to the broad level of services each center offers to all qualifying people, not the per-visit level.

This distinction matters. If "scope," at least as it's used in Section 1396a(bb), refers to services on a per-visit basis, but "amount" and "duration" don't, then Florida's current definition can't be right. Imagine a clinic has an optometry unit and a general dentistry unit. One year, it eliminates its optometry unit. That elimination changes the "amount of services" because there is now one fewer service available to the general public at the clinic.[1] And under Florida's current definition, the "scope of services" has also changed because the optometry unit is gone. This is, of course, effectively the same thing. But "amount" and "scope" can't mean the same thing. So the State's current definition can't be correct.

In reworking its plan, the State can avoid this problem in several ways. For example, it *might* define "scope" to mean, as the Majority Opinion contemplates, the "extent" or "range" of something. *See* Maj. Op. at 8–9. Florida could also define "scope" to mean, for instance, a change in the frequency with which specific services are administered. Indeed, states have defined "changes in the scope of service" in a variety of ways. *See, e.g.*, Dkt. No. 72-2 (Ex. 1-A).

The point is that the State may wish to consider the level of analysis that "scope," "amount," and "duration" refer to. It could

---

[1] Florida contends that "amount" refers to the number of patient visits. But Congress uses "visit[s]" in the statute, so if it intended for "amount" of "services" to mean "number of visits" as opposed to "number of services," it would have said so. *See Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 232 F.3d 854, 859 (11th Cir. 2000) ("[W]hen Congress uses different language in similar sections, it intends different meanings.").

be center-specific, or visit-specific, as I've mentioned. And that could offer one means of finding the daylight between the term "scope" and other terms used in the statute, like "amount" and "duration," since "scope" can't be purely coextensive with those terms.

*Second*, I don't find convincing the State's argument that a broader definition of "scope of services" is at odds with Congress's having moved away from a cost-based reimbursement model to a prospective payment system. What could possibly be the point of adjusting reimbursement rates for changes in the "scope of such services," if not to account for changes in underlying costs? To be sure, reimbursements are no longer based on the reasonable costs a center incurs in a year. But that does not mean that Congress, in instituting the prospective payment model, intended for reimbursement calculations to ignore costs altogether. If that were Congress's intent, it wouldn't have included adjustments for changes in scope. It could have stopped at adjustments based on the Medicare Economic Index.

*Third*, I'm also not persuaded by the State's argument that because the Medicare Economic Index accounts for changes beyond adding or eliminating services, defining "scope" more broadly necessarily results in double-counting. The Medicare Economic Index merely adjusts Medicare payment rates by small percentages to cover some inflationary increases in the costs of providing medical care. In other words, the index partially accounts for the effect of inflation on healthcare providers' wages and office overhead. But the index was not designed to (and does not) account for

differences in the scope of standard-of-care treatment—procedures, tests, and drugs that a particular provider may offer—for the same condition. Simply put, inflation is not the same thing as a difference in the scope of services.

In sum, I agree with the Majority Opinion's decision to affirm the district court's decision sending the State back to the drawing board. And in doing so, I offer these points in the hope that they may aid the State in rewriting its plan to comply with federal law.